UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

                                         File No. 1:01-CR-101

v.

                                         HON. ROBERT HOLMES BELL

KENNETH MERS,

       Defendant.

_____/

**O P I N I O N**

This matter comes before the Court on Defendant Kenneth Mers' motion under 28 U.S.C. § 2255 to vacate, set aside, or correct the sentence imposed upon him by this Court on December 3, 2001.

**I.**

On August 31, 2001, following a three-day jury trial, Defendant was convicted of one count of conspiracy to distribute and to possess with intent to distribute more than 100 kilograms of marijuana in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(B)(vii).

The conviction arose from an alleged conspiracy involving Defendant and four other co-defendants: James Carver, Luis Alaniz, Jack Neve and Mark Marcus.  At trial, all four of the co-defendants testified against Defendant.  Jack Neve testified that he had known Defendant for over 30 years. Defendant had moved to Colorado, but the two maintained frequent and regular telephone contact.  In December 2000, Defendant asked Neve if he

would be willing to store a quantity of marijuana at his home in Michigan.  The topic was discussed several times thereafter.  (Tr. at 11-12, 91.)  In February 2001, Neve agreed to be contacted by Luis Alaniz, whom he had met through Mers a number of times  beginning 25 years previously.  (Tr. at 12-13, 74.)  Alaniz subsequently called Neve, stating, "I understand you want to go to work for us."  (Tr. at 14.)

A couple of days later, on late March 8 or early March 9, 2001, Carver and Alaniz arrived at Neve's home with a brick[1] of marijuana.  (Tr. at 65-66.)  The three cut open the brick.  Neve was told that he could sell the marijuana, paying $850.00 per pound.  Neve also was told that he would be paid $10.00 per pound for storing the marijuana, consistent with what Mers previously had told Neve.  (Tr. at 16, 36.)  After Alaniz and Carver left, fifteen minutes before Neve left home for a week-long cruise, Neve called Defendant in Colorado to tell him that the marijuana had arrived.  (Tr. at 17, 36, 244.)

Neve returned from the cruise at 9:00 p.m. on March 18, 2001.  (Tr. at 17, 97.)  He testified that Alaniz and Carver called the next day.  (Tr. at 97.)  They came over to Neve's house with 25 more bricks of marijuana.  Alaniz carried them all to the basement and Defendant spent an hour concealing them.  (Tr. at 18.) Three days later, Alaniz and Carver picked up five bricks.  A couple of days later, they took three more bricks.  (Tr. at 20.)

---

[1]According to the testimony, each brick involved in the case weighed approximately 20 pounds.  (Tr. at 19.)

On March 24 or 25, 2001, Defendant Mers arrived at Neve's house.  Within a day or so, Carver and Alaniz brought a digital scale to the house.  Carver, Alaniz, Neve and Defendant all played with the scale to see how it worked.  (Tr. at 20-22.)  The four men discussed the lowering of the price per pound and pushed Neve to contact old connections to sell the marijuana.  (Tr. at 22.)

Defendant Mers and Neve opened one brick and weighed out one-pound bags for distribution.  (Tr. at 22-23.)  Mers took one pound of marijuana from his car.  He and Neve smoked some and compared it with the new marijuana to see the difference between that delivered by Carver and Alaniz to Mers in Colorado and to Neve in Michigan.  (Tr. at 23, 55.)  Mers then exchanged his pound from Colorado for the one from Michigan, telling Neve to advise Carver and Alaniz.  (Tr. at 23.)  Mers put approximately ten pounds in a trash bag and put it in the trunk of his car.  (Tr. at 24.)  Mers subsequently distributed the pounds for approximately $1,000.00 a pound.  (Tr. at 24.)

Shortly after arriving in Michigan, Mers joined his Colorado roommate, Jason Booth, and Jason's brother, Michael, who lived in Mt. Pleasant.  The three went fly fishing on the Pere Marquette River for three days.  (Tr. at 25.)  Prior to the trip, Mers introduced Neve to Booth by telephone, expecting that Neve would subsequently collect money from Booth after Mers returned to Colorado.  (Tr. at 26.)

Carver, Alaniz, Neve and Defendant met at the Bedford Steakhouse, where Neve and Mers gave Carver money.  (Tr. at 27-28.)  Neve testified that the $1,000.00 he gave Carver

had previously been given to him by Defendant Mers with instructions to give it to Carver or Alaniz. (Tr. at 27.)  The four men talked about Defendant going to Mexico to supervise the growing of marijuana on a farm controlled by Alaniz and Carver.  (Tr. at 28, 86-87.) Mers returned to Colorado shortly thereafter.  Prior to leaving, he took an unspecified amount of marijuana out of Neve's basement.  (Tr. at 28.)

Carver and Alaniz left for Texas and Mexico before Defendant returned to Colorado. (Tr. at 29.)  On May 3, 2001, Alaniz called Neve from a local Pizza Hut seeking money. Neve took an envelope Mers had left him and drove to the Pizza Hut.  Approximately an hour later, Carver called, saying he and Alaniz wanted to come out and talk to Neve.  (Tr. at 29-30.)  When they arrived, they talked at length.  Carver advised he would be crossing the border into Mexico, as he was a federal fugitive.  They told Neve they had a 1,600-pound load already in Texas, and Alaniz and his brother were going to bring it to Neve's home, which would serve as a headquarters.  (Tr. at 30.)  Neve testified that he did not sleep for a day, worrying about what he had gotten into and how it would affect his home life and his health.  On May 4, 2001, as he was returning from a visit to his mother, he saw a police car with a Silent Observer sticker on it.  He decided to call to report the scheme.  (Tr. at 30-31.) The police arrived at his home in the early morning hours of May 5, 2001.  (Tr. at 31.)  The police took all of the remaining marijuana from the home.  They asked Neve if he had placed the call.  Neve denied it at that time.  After the police left, he called Defendant in Colorado and told him the "[r]oof caved in on everybody. . . . Run for the hills."  (Tr. at 31.)  He then

called Special Agent Latham of the Customs Service and reported that he wanted to come clean and that he had, in fact, been the person who called the Silent Observer line. (Tr. at 32.) Neve testified that he was never paid for storing the marijuana. (Tr. at 37.)

Battle Creek Police Officer Scott Eager testified that an anonymous tip was received on May 4, 2001 about two individuals staying at a Super 8 Motel who were involved in delivering marijuana. (Tr. at 103.) Eager went to the motel, where he encountered Alaniz and Carver. (Tr. at 103-04.) Eager seized an address book belonging to Alaniz, which contained the names of Mers and Marcus and the initials of Neve, together with a corresponding telephone number. (Tr. at 104-05, 124-25.)

Alaniz testified that he first traveled to Michigan with Carver in December 2000. In March 2001, they came back to Michigan, carrying approximately 850 pounds of marijuana, which they intended to deliver to a buyer in Detroit. (Tr. at 109-11.) When they arrived, however, they discovered the buyer was dead. They then contacted a variety of people, including Mark Marcus, in an attempt to sell the load. (Tr. at 111.) Marcus came to Ypsilanti to pick up nine bricks of approximately 20 pounds each. Terrance Williams of Detroit picked up ten bricks. (Tr. at 112-14.) Alaniz contacted Defendant Mers to see if he could take the remaining 480 to 500 pounds to Jack Neve's house. (Tr. at 114, 117.)[2]

---

[2] Alaniz had known Defendant Mers since the 1970s, but he had not seen Mers since 1976. (Tr. at 118-20, 126-27.) However, in October or November 2000, Alaniz contacted Defendant Mers, after obtaining his telephone number from Marcus. Between Thanksgiving and Christmas 2000, Alaniz and Carver delivered eight or nine boxes of marijuana to Defendant in Colorado. (Tr. at 127, 135, 197-98, 205-06.)

5

After talking to Neve, Mers called Alaniz and gave him Neve's telephone number. Alaniz called Neve. Alaniz and Carver then went to Neve's house to talk to him and check him out. (Tr. at 117.) They eventually stored the remaining marijuana at Neve's house. (Tr. at 117, 131.)

Alaniz and Carver returned to Texas for eight to ten days to look at some additional marijuana, and they came back to Michigan on May 3, 2001. (Tr. at 121-22.) On approximately May 4, they retrieved five pounds of marijuana from Neve's house to deliver to Mr. VanMiddlesworth. When VanMiddlesworth was not at home, they took the marijuana to Marcus' garage. (Tr. 122.) While they were at his house, Neve gave them an envelope containing $4,000.00.

Alaniz testified that he, Carver, Mers and Neve met at the Bedford Steakhouse on one occasion to discuss the marijuana, though he claims the actual discussion was held between Carver, Mers and Neve in the basement of Neve's house. Alaniz testified that he was upstairs at the time and did not participate. (Tr. at 123-24.) Alaniz identified a notebook as his, testifying that he had last seen it at the time of his arrest. The book included Mers' name and a telephone number through which Alaniz could reach Mers. Neve's phone number was listed and identified with the initials "JN." (Tr. at 125.)

Carver testified that he obtained 900 pounds of marijuana in Texas at the end of February 2001, which he intended to deliver to a person in Detroit. Upon arrival in Detroit at the beginning of March 2001, he and Alaniz discovered that the person who was to take

delivery was dead. (Tr. at 140-41.) Carver found Terrance Williams in Detroit, who agreed to take about 185 pounds of the marijuana. Marcus also took nine bricks of the marijuana. (Tr. at 142-43.) Alaniz told Carver that he knew a few other individuals to call. In Carver's presence, Alaniz called Defendant Mers. (Tr. at 143-44.) Alaniz told Mers that he had a large load and asked Mers if he could help sell and distribute it. Carver himself took the phone and asked Mers if he knew of a place they could store it. Mers asked to speak with Alaniz again and then gave Alaniz Neve's telephone number. (Tr. at 143-44.)

Carver had spoken to Mers on a prior occasion. In December of 2000, Carver and Alaniz delivered 80 pounds of marijuana to Mers in Colorado. Sometime between that delivery and the March 2001 contact, Carver had spoken with Mers, who called to obtain authorization to use some of the sale proceeds to purchase a 1991 Cadillac. (Tr. at 144-45.) The government introduced purchase documents signed by Neve to obtain a green 1992 Cadillac El Dorado. (Tr. at 157; Gov't Ex. 10.)

Carver testified that they called Neve and, about two days later, took a 20-pound brick of marijuana to Neve's house. After showing Neve the brick, they received approval to bring the rest of the load. (Tr. at 145-46.)

In the interim, Carver had discussions with Mers. Mers agreed that he could sell the remainder of the marijuana, but he would need two to three months to do so. (Tr. at 147, 148.) Carver told Mers that the marijuana was priced at $850 per pound. (Tr. at 146.) Carver denied giving a price for storage only. (Tr. at 147.) Mers subsequently came to

Michigan, driving a green 1990-91 Cadillac. (Tr. at 147-48.) Mers and Carver met at Neve's house and Mers gave Carver $3,500.00, a sum Carver understood to be a payment for the Colorado marijuana. (Tr. at 148.) Mers put some marijuana in the back of his car and told Carver he was going to Colon, Michigan, which is located near Mt. Pleasant. (Tr. at 149.) A few days later he saw Mers again at Marcus' house. (Tr. at 149.)

A day or two later, Carver reported meeting with Neve, Mers and Alaniz at a steakhouse in Bedford, where they discussed the timetable for selling the marijuana. Mers stated that it would take him three months, but he would get going on it. (Tr. at 150.) The parties discussed using Neve's house for future deliveries, and Neve agreed to warehouse the marijuana. Carver was unsure if Neve intended to sell any marijuana or not. (Tr. at 150.)

Carver returned to Texas with $52,000.00 as partial payment for the marijuana. He returned to Michigan on May 2, 2001. (Tr. at 152.) When they returned to Michigan, they contacted James VanMiddlesworth, a friend of Alaniz. VanMiddlesworth agreed to take some more marijuana. Carver contacted Neve and told him they needed to come by to pick up some marijuana. Neve told him they needed to come at that time because he was leaving town for the weekend. They picked up five bundles of marijuana. (Tr. at 152-53.) When they called VanMiddlesworth, however, he also was leaving town and could not accept delivery until the following Monday. Carver then called Marcus, who agreed to allow them to store it in his garage for the weekend. (Tr. at 153-54.) On May 5, 2001, the government

8

seized approximately 44 kilograms of marijuana from Marcus' garage. (Tr. at 187.)  Carver and Alaniz were arrested at their motel by the Battle Creek police. (Tr. at 154.)

Mark Marcus testified that he had known Alaniz since the early 1970s and met Carver in December 2000 or January 2001. He previously had entered into a drug transaction with Carver and had received nine bricks of marijuana at that time. (Tr. 190-92.) Marcus also had known Mers since about 1970. (Tr. at 192.) Marcus testified that he had seen Mers a couple of times in the spring of 2001, when Mers dropped by his house. They talked about the price of $850.00 per pound that they were being charged by Carver for the marijuana. (Tr. at 193.) Carver and Alaniz called Marcus near 11:00 one evening and asked if he could put some marijuana in Marcus' garage for 24 hours. Marcus agreed. The police raided his garage the next day. (Tr. at 194-95.) Marcus called Mers within the next two days to let him know he had been raided and that Carver and Alaniz had been arrested. (Tr. at 195.)

Carl Rogers testified that he had known Defendant Mers since the mid- to late-1970s. On March 27, 2001, Defendant showed up at Rogers' brother's house in a green Cadillac. Mers asked Rogers if he could help him sell some marijuana. He asked for $1,200 per pound. (Tr. at 212-13.) Rogers called two people and set Defendant up with them. (Tr. at 213, 215.) Mers left a container of marijuana with Rogers, though Rogers purportedly did not open it. (Tr. at 214.) Mers knew where Rogers hid the container. (Tr. at 215.) The marijuana was picked up, presumably by Mers, sometime within the next three days. (Tr. at 214.) Rogers testified that on the Thursday before trial, his wife was contacted by Mers, who

wanted her to testify on his behalf.  (Tr. at 215.)  On the Friday before trial, Mers came to Rogers' brother's house and Rogers told him he had been subpoenaed to testify and could not talk to Mers.  Mers told Rogers to be sure to deny everything.  (Tr. at 216.)

Michael Booth testified that his brother, Jason, was one of Defendant's roommates in Colorado.  (Tr. at 221.)  In the spring of 2001, Michael, Jason and Defendant planned a one-week fishing trip in Michigan.  (Tr. at 222.)  Michael Booth met Defendant about a week before the planned trip when Defendant claimed to be coming through Mt. Pleasant.  (Tr. at 225.)  At that time, Defendant talked to Michael about selling marijuana, and Michael arranged for a purchase by one person.  (Tr. at 223.)  Mers asked Michael to store a box of marijuana, which he agreed to do.  (Tr. at 224.)  A few days later, Jason arrived and Defendant returned and the three went fishing.  After Jason returned to Colorado, Defendant again came to visit Michael.  They went fishing, and, on the way back, Defendant picked up his marijuana.  (Tr. at 225.)  Mers gave Michael Booth the name and number of "Jay," a friend of his whom Michael was told could be called if Michael ever wanted any more marijuana.  (Tr. at 225-26.)  Michael Booth reported that he saw Defendant after he had been arrested.  They went fly fishing in Grayling.  Defendant told Booth that he had been set up and that he had nothing to do with the offense.  (Tr. at 227.)  Defendant told Booth that if he was contacted by federal prosecutors, he should say he did not know anything.  (Tr. at 228.)

After introducing evidence of telephone records, the prosecution rested.  (Tr. at 247.) The defense introduced no evidence.  (Tr. at 248.)  On August 30, 2001, the jury returned a guilty verdict against Defendant on Count I of the indictment.

On November 27, 2001, Defendant filed a motion for new trial, raising a claim of newly discovered evidence with respect to Carver's black book, which was confiscated by the police at the time of Carver's arrest.  The book was not introduced as evidence in the trial, but was relied upon by the probation office in preparing the presentence report.  On December 3, 2001, the Court denied Defendant's motion for new trial and sentenced him to 78 months in prison and a $3,540.00 fine.  In reaching its sentencing determination, the Court imposed a three-point enhancement for obstruction of justice.  Defendant appealed his sentence, raising three major claims: (1) abuse of discretion in the Court's admission of evidence relative to Defendant's prior drug trafficking with two of the co-defendants; (2) abuse of discretion in denying the motion for new trial based on newly discovered evidence; and (3) error in sentencing when the jury did not make a specific finding as to the amount of marijuana with which Defendant was involved.  On August 28, 2003, the Sixth Circuit affirmed on all grounds.  *See United States v. Alaniz*, 75 Fed. Appx.  344 (6th Cir. 2003), *cert. denied* 540 U.S. 1212 (2004).

11

Defendant filed the instant motion to vacate, set aside, or correct sentence on February 12, 2005.[3]  In his motion, Defendant raises eight interrelated grounds for relief: (1) ineffective assistance of counsel; (2) perjury by government witnesses; (2) newly discovered evidence of Carver's black book; (4) withholding of exculpatory evidence of Carver's black book, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); (5) plain error in Court's refusal to grant new trial; (6) abuse of discretion in Court's failure to determine that Neve perjured himself; (7) miscarriage of justice in Court's misquoting of Neve's testimony and diminishment of impeachment value of black book; (8) violation of Sixth Amendment right in sentencing determination that Defendant obstructed justice.[4]

---

[3]The one-year statute of limitations for filing Defendant's § 2255 motion began to run on the date the Supreme Court denied certiorari on his appeal, February 23, 2004.  Under Sixth Circuit precedent, a prisoner's habeas motion is deemed filed when handed to prison authorities for mailing to the federal court. *Cook v. Stegall*, 295 F.3d 517, 521 (6th Cir. 2002); *In re Sims*, 111 F.3d 45, 47 (6th Cir. 1997).  Defendant signed his motion for relief from judgment on February 12, 2005 and it was received by this Court on March 4, 2005.  Thus, it must have been handed to prison officials for mailing at some time between February 12 and March 4, 2005.  For purposes of this case, the Court gave Petitioner the benefit of the earliest possible filing date.

[4]The Court notes that Defendant's form motion listed only the first four grounds, but his attached memorandum in support of the motion set forth eight substantive issues.  The grounds, however, were not numbered consistently.  Grounds I, IV, V, VI, VIII and IX were numbered using roman numerals.  Two un-numbered but separate headings were included between grounds I and IV, which have been construed by the Court as grounds II and III.  The memorandum included no ground VII.  The Court has consecutively renumbered the claims as grounds I through VIII.

## II.

A prisoner who moves to vacate his sentence under § 2255 must show that the sentence was imposed in violation of the Constitution or laws of the United States, that the court was without jurisdiction to impose such sentence, that the sentence was in excess of the maximum authorized by law, or that it is otherwise subject to collateral attack.  28 U.S.C. § 2255.  To prevail under § 2255, "a petitioner must demonstrate the existence of an error of constitutional magnitude which had a substantial and injurious effect or influence on the guilty plea or the jury's verdict."  *Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2003) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).  "Relief is warranted only where a petitioner has shown 'a fundamental defect which inherently results in a complete miscarriage of justice.'"  *Id.* (quoting *Davis v. United States*, 417 U.S. 333, 346 (1974)).

In order to obtain collateral relief under § 2255, a petitioner must clear a significantly higher hurdle than would exist on direct appeal.  *United States v. Frady*, 456 U.S. 152, 166 (1982).  A petitioner is procedurally barred from raising claims in a § 2255 motion, even those of constitutional magnitude, to which no contemporaneous objection was made or which were not presented on direct appeal.  *Frady*, 456 U.S. at 167-68; *Nagi v. United States*, 90 F.3d 130, 134 (6th Cir. 1996).  Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in a motion under § 2255 only if the defendant first demonstrates either cause for the default and actual prejudice or that he is actually innocent.  *Bousley v. United States*, 523 U.S. 614, 622 (1998).  The procedural

default rule does not apply, however, to claims of ineffective assistance of counsel. Claims of ineffective assistance of trial counsel generally are not reviewable on direct appeal, because the record may be inadequate to permit review. *See United States v. Kincaide*, 145 F.3d 771, 785 (6th Cir. 1998); *United States v. Tucker*, 90 F.3d 1135, 1143 (6th Cir. 1996). Consequently, such claims may be raised for the first time in a § 2255 proceeding, without regard to a failure to raise them on direct appeal. *See Tucker*, 90 F.3d at 1143; *United States v. Allison*, 59 F.3d 43, 47 (6th Cir. 1995).

In an action to vacate or correct the sentence, a court is required to grant a hearing to determine the issues and make findings of fact and conclusions of law "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief. . . ." 28 U.S.C. § 2255.

> The statute "does not require a full blown evidentiary hearing in every instance . . . . Rather, the hearing conducted by the court, if any, must be tailored to the specific needs of the case, with due regard for the origin and complexity of the issues of fact and the thoroughness of the record on which (or perhaps, against which) the section 2255 motion is made."

*Smith v. United States*, 348 F.3d 545, 550-51 (6th Cir. 2003) (quoting *United States v. Todaro*, 982 F.2d 1025, 1030 (6th Cir. 1993)). No evidentiary hearing is required if the petitioner's allegations "cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Engelen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995), *quoted in Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999). Where the judge considering the § 2255 motion also

14

conducted the trial, the judge may rely on his or her recollections of the trial.  *Blanton v. United States*, 94 F.3d 227, 235 (6th Cir. 1996).

## III.

The files and records in this case conclusively show that Defendant is not entitled to relief on his motion.

### A.    Ineffective Assistance of Counsel

In *Strickland v. Washington*, 466 U.S. 668, 687-88  (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.   The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.

Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if he was not prejudiced by counsel's error. *Id.* at 691. To establish prejudice, the defendant must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. To determine if the defendant was prejudiced by his attorney's performance, it is necessary to determine if the proceeding was fundamentally unfair or unreliable; a court should not focus the analysis on the outcome. *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993).

When deciding a claim of ineffective assistance of counsel, a court "need not address both components of the inquiry 'if the defendant makes an insufficient showing on one.'" *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 697). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697.

Defendant contends that his trial attorney was ineffective in seven ways: (1) by failing to interview co-defendant Alaniz before trial; (2) by failing to conduct ongoing discovery so as to obtain Carver's black book; (3) by failing to effectively impeach Neve; (4) by failing to challenge the prosecution's nondisclosure of Carver's black book on the basis of *Brady*, 373 U.S. 83; (5) by failing to raise a Sixth Amendment challenge to the Court's sentencing

16

determination that Defendant had obstructed justice; (6) by failing to respond to Defendant's letters in opposition to the government's brief on appeal; and (7) by failing to timely notify Defendant of the Sixth Circuit's affirmance of his conviction, thereby preventing Defendant from filing a motion for rehearing *en banc*.

### 1.    Failure to Interview Alaniz

Defendant argues that he specifically told defense counsel that Alaniz would provide evidence that Defendant was not involved in the Michigan marijuana conspiracy.  He alleges that counsel repeatedly told him that he could not interview Alaniz as he was a represented defendant in the action.  After trial, Alaniz provided an affidavit from Alaniz stating that Neve, contrary to his trial testimony, was involved in selling marijuana and told Alaniz on the phone that he had $25,000.00 in cash.  According to Alaniz, Neve personally delivered $4,000.00 to Alaniz on May 3, 2001.  (Mot. for New Trial, Docket # 115.)

As the government notes, defense counsel was barred by the Michigan Rules of Professional Conduct, Rule 4.2, from "communicat[ing] about the subject of the representation with a party whom the lawyer knows to be represented in the matter by another lawyer, unless the lawyer has the consent of the other lawyer or is authorized by law to do so."  *Id.*  Defense counsel cannot be said to have operated outside the wide range of professional competence in following professional ethical requirements.

Moreover, the central facts of this claim were raised in Defendant's appeal of the denial of his motion for new trial.  The claim was rejected by the Sixth Circuit, which

concluded that Defendant could not demonstrate that Alaniz's testimony would have altered the result of the proceeding. Essentially, Alaniz's testimony was impeachment evidence concerning Neve's culpability. Regardless of Neve's relative culpability, both Neve and Carver testified to Mers' involvement in the sale. The trial court held that, assuming that counsel would have discovered that Alaniz would testify consistently with his post-trial affidavits, that testimony would not have affected the outcome at trial. (Sent. Tr. at 27, 34-35.) The Sixth Circuit affirmed that conclusion. *See Alaniz*, 75 Fed. Appx. 344, 351 (6th Cir. 2003). The prior holdings of this Court and the Sixth Circuit, therefore, constitute the law of the case on the question whether Defendant has shown "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A defendant may not relitigate in a § 2255 motion issues that were decided against him on appeal. *DuPont v. United States*, 76 F.3d 108, 110 (6th Cir. 1996). As a result, assuming counsel's failure to investigate was error, Defendant cannot demonstrate the necessary prejudice to support a finding of ineffective assistance of counsel.

Finally, Alaniz's affidavit that Neve was selling marijuana and that Mers was not involved is at odds with Alaniz's own trial testimony. Alaniz testified that he called Mers to see if Neve could possibly store the marijuana (Tr. at 114); that Mers was involved in a discussion of the drug distribution with Carver and Neve in Neve's basement (Tr. at 124); and and that part of the reason Mers came to Michigan was to look at the marijuana and

18

determine whether he was interested in distributing it. (Tr at 134.) Alaniz's post-trial statements implicitly undermine the general import of his trial testimony to the effect that Mers was involved in the conspiracy. As a result, his post-trial affidavit amounts to an implicit retraction of his trial testimony and should be regarded with extreme suspicion. *See United States v. Gordon*, 257 F.3d 636, 644 (6th Cir. 2001); *United States v. Chambers*, 944 F.2d 1253, 1264 (6th Cir. 1991). In the face of that contradiction and the general reluctance to credit retractions, and further in light of the testimony of the remaining witnesses, Alaniz's post-trial affidavits are not credible. Counsel, therefore, may not be found ineffective for failing to adduce the evidence at trial.

For all the stated reasons, the Court rejects Defendant's first claim of attorney error.

### 2. Failure to obtain black book

Defendant asserts that defense counsel was ineffective in failing to conduct ongoing discovery to obtain Carver's black book, which was in the possession of the prosecution. Although the prosecutor maintained that the black book was made available for inspection at the time defense counsel inspected the other evidence, defense counsel averred that he never saw the book and it was not made available to him at that time. According to defense counsel, Carver's black book came to counsel's attention after review of the presentence report, which contained references to amounts of 1,500, 25,000, and 2,000, all of which ostensibly were taken from Carver's book.

Counsel promptly moved for a new trial.  At the hearing on the motion for new trial, the Court inquired as to the evidence allegedly contained in Carver's black book.  Defendant relied upon three notations in the book next to the initial "J" for amounts of 1,500, 2,500, and 2,000.  The parties agreed that the figure of 25,000 included in the presentence report was a typographical error.  (Sent. Tr. at 10.)

Defendant argues that the numbers contained in Carver's black book support a conclusion that Neve was selling marijuana rather than merely storing it, as he testified.  Defendant, however, has not presented evidence of the meaning of the entries in Carver's book, and Carver is now deceased.  However, even if the entries in the black book were assumed to refer to Neve's payments of monies for his drug sales, they would be merely impeaching of Neve's testimony that he did not sell any of the marijuana.  That testimony, however, was of limited significance in light of Neve's admission to the substantial wrongful behavior of storing approximately 500 pounds of marijuana.

Further, the question of whether Neve sold any of the drugs was tangential to Neve's overall credibility.  The numbers contained in Carver's black book, even if admissible, would not have undermined Neve's credibility in any substantial way and would not have altered the outcome of the trial.

Finally, the significance of the black book was previously raised to this Court in the motion for new trial and on appeal to the Sixth Circuit.  Both courts concluded that the introduction of the figures from the black book would not have produced a different outcome

at trial.  *See* Sent. Tr. at 28-25; *Alaniz*, 75 Fed. Appx. at 351.  As previously discussed, a defendant may not relitigate in a § 2255 motion issues that were decided against him on appeal.  *DuPont*, 76 F.3d at 110.

Accordingly, assuming defense counsel unreasonably failed to discover the existence of Carver's black book, Defendant cannot demonstrate a reasonable probability that introduction of the black book would have altered the outcome at trial.  *See Strickland*, 466 U.S. at 694.

### 3.    Failure to effectively impeach Neve

Defendant argues that his attorney was ineffective in his cross-examination of Neve and failed effectively to impeach him.  In support of this allegation, Defendant again relies on his attorney's failure to interview Alaniz or to discover Carver's black book.  The Court has fully discussed both issues and finds no error.   Defendant's third claim of ineffective assistance is rejected for the reasons previously discussed.

### 4.    Failure to raise a *Brady* claim

Defendant next asserts that counsel was ineffective in failing to raise a challenge under *Brady*, 373 U.S. 83, to the government's failure to reveal the existence of Carver's black book.  In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  As the Sixth Circuit recently has discussed, however, not all

failures to disclose information constitute *Brady* violations.  *See Spirko v. Mitchell*, 368 F.3d

603, 609 (6th Cir. 2004).  Instead, the materiality requirement of *Brady* requires that the

evidence is such that there exists a reasonable probability that, had the evidence been

available, the jury would have reached a different result.  *Id.* (citing *United States v. Bagley*,

473 U.S. 667, 675 (1985) (discussing materiality); *Kyles v. Whitley*, 514 U.S. 419 (1995)

(reasonable probability of a different result is shown "when the government's evidentiary

suppression undermines confidence in the outcome of the trial.") (internal citations omitted).

*See also Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) (to constitute a true *Brady*

violation, "[t]he evidence at issue must be favorable to the accused, either because it is

exculpatory, or because it is impeaching; that the evidence must have been suppressed by the

State, either willfully or inadvertently; and prejudice must have ensued.").

Here, as the Court held in denying the motion for new trial, even assuming that the

government did not reveal the evidence to Defendant and that the evidence was impeaching,

Defendant fails to demonstrate the materiality necessary to constitute a *Brady* violation.

Accepting as true that the entries in Carver's book actually refer to Neve's payments for

selling a portion of the marijuana, the evidence does not undermine either Neve's or Carver's

testimony regarding Defendant's involvement in the conspiracy.  *See Spirko*, 368 F.3d at 611.

Because Defendant is unable to demonstrate that the failure to disclose Carver's black

book amounted to a *Brady* violation, Defendant fails to show that counsel was ineffective in

failing to challenge the withheld information on the basis of *Brady*.  *See Chegwidden v.*

*Kapture*, 92 Fed. Appx. 309, 311 (6th Cir. 2004) (an attorney's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel); *see also A.M. v. Butler*, 360 F.3d 787, 795 (7th Cir. 2004); *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994); *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990); *United States v. Wright*, 573 F.2d 681, 684 (1st Cir. 1978).

5.     **Failure to raise Sixth Amendment objection to Court's obstruction of justice determination at sentencing**

Defendant asserts that his attorney provided ineffective assistance when he failed to object to the Court's enhancement of his sentence based on a finding that Defendant obstructed justice. Defendant argues that, pursuant to *United States v. Booker*, 125 S. Ct. 738 (2005), the Sixth Amendment requires that factual findings that increase a defendant's maximum sentence under the federal sentencing guidelines must be made by the jury.

Defendant cannot demonstrate that counsel's performance fell below an objective standard of reasonableness.  *See Strickland*, 466 U.S. at 688.  At the time of Defendant's sentencing in 2001, the Sixth Circuit had held that judicial factfinding under the federal sentencing guidelines did not violate the Sixth Amendment under the reasoning of *Apprendi v. New Jersey*, 530 U.S. 466 (2000).  *See United States v. Harris*, 238 F.3d 777, 779 (6th Cir. 2001); *United States v. Johnson*, 24 Fed. Appx. 376, 380 (6th Cir. 2001); *United States v. Elliott*, No. 99-5994, 2000 WL 1175600 (6th Cir. Aug. 9, 2000).  Moreover, even following the decision in *Blakely v. Washington*, 542 U.S. 296 (2004), which extended the reasoning of *Apprendi* to factors enhancing state sentencing guidelines, the Sixth Circuit continued to

23

hold that the decisions did not apply to the federal sentencing guidelines. *See United States v. Koch*, 383 F.3d 436, 442 (6th Cir. 2004). As a result, only after the issuance of the *Booker* decision in 2005 did it become clear that judicial factfinding under the federal sentencing guidelines could violate the Sixth Amendment. Accordingly, on the basis of the law as it existed at the time Defendant was sentenced, counsel's advice not to appeal was objectively reasonable and did not constitute ineffective assistance of counsel. *See United States v. Burgess*, 142 Fed. Appx. 232, 241 (6th Cir. 2005) (failure to predict Supreme Court's decision in *Booker* does not constitute ineffective assistance).

Moreover, the Sixth Circuit since has held that the Supreme Court's decision in *Booker*, 125 S. Ct. 738, and its earlier decision in *Blakely*, 542 U.S. 296, both constituted "new rules" of criminal procedure, though they did not meet the requirements for retroactive application set forth by the Supreme Court in *Teague v. Lane*, 489 U.S. 288 (1989). *See Humphress v. United States,* 398 F.3d 855, 860-863 (6th Cir. 2005). Defendant therefore is not entitled to retroactive application of *Booker* to this collateral proceeding.

### 6. Failure to respond to Defendant's letters

Defendant next argues that his attorney provided ineffective assistance of counsel by failing to respond to Defendant's letters, in which he challenged misstatements in the government's brief on appeal. Defense counsel denies Defendant's contention that counsel failed to communicate.

Regardless of whether counsel responded to Defendant's communications, Defendant cannot demonstrate ineffective assistance of counsel. Defendant makes no effort to demonstrate how counsel's failure to reply to Defendant's letters resulted in the necessary prejudice required under the *Strickland* standard. *See Strickland*, 466 U.S. at 691. Defendant's claim therefore must be rejected. *Id.* at 697.

### 7. Failure to notify Defendant of appellate decision

In his final claim of attorney error, Defendant asserts that counsel failed timely to notify him of the Sixth Circuit's decision on direct appeal. While Defendant was appointed new appellate counsel who filed a petition for writ of certiorari, Defendant objects that the delay resulted in forfeiture of his right to seek rehearing *en banc* in the Sixth Circuit.

Such a claim does not present an appropriate basis for relief under 28 U.S.C. § 2255. A defendant does not have a constitutional right to seek rehearing *en banc*. *See McNeal v. United States*, No. 94-4146, 1995 WL 290233, at *2 (6th Cir. May 11, 1995). "[W]here there is no constitutional right to counsel, the client's constitutional rights cannot be violated by the allegedly defective performance of his lawyer." *Id.*; *see also U.S. v. Chandler*, 291 F. Supp. 2d 1204, 1213 (D. Kan. 2003) (same). Accordingly, Defendant's final claim of attorney error is rejected.

### B. <u>Remaining Claims</u>

As the Court previously noted, with the exception of claims of ineffective assistance of counsel, where a defendant has procedurally defaulted a claim by failing to raise it on

direct review, the claim may be raised in a motion under § 2255 only if the defendant first demonstrates either cause for the default and actual prejudice or that he is actually innocent. *Bousley*, 523 U.S. at 622.  As cause excusing his procedural default of his claims, Defendant raises the ineffective assistance of counsel.  The Court previously has discussed each of Defendant's ineffective assistance of counsel claims as they relate to the substantive issues and has found them to be without merit.  Accordingly, Defendant has failed to demonstrate cause excusing his procedural default.  He further has failed to establish that he is actually innocent of the offense for which he is convicted.  *Id.*  He therefore is barred from raising his remaining substantive issues in this § 2255 proceeding.

## IV.

The files and records in this case conclusively show that the Defendant is entitled to no relief under § 2255.  Accordingly no evidentiary hearing is required to resolve the merits of the pending motion.  For the reasons stated herein, the motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255 must be denied.  An order consistent with this opinion will be entered.

Date:   <u>December 16, 2005</u>   <u>/s/ Robert Holmes Bell</u>
ROBERT HOLMES BELL
CHIEF UNITED STATES DISTRICT JUDGE